IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**KIM ELIZABETH HODGSON**,

    Plaintiff         Civil No. 3:10-cv-6261-ST

   v.           **FINDINGS AND**
                 **RECOMMENDATION**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

    Defendant.

STEWART, Magistrate Judge:

  Plaintiff, Kim Hodgson ("Hodgson"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act ("Act").  This court has jurisdiction under

1 -  FINDINGS AND RECOMMENDATION

42 USC § 405(g).  For the following reasons, the Commissioner's decision should be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

On July 5, 2007, Hodgson filed an application for SSI, alleging a disability beginning September 15, 1998, due to a back injury.  Tr. 85, 99.[1]  She was born in 1961 (Tr. 85), reports a tenth-grade education (Tr. 105) and has worked as a caregiver and pizza cook.  Tr. 118.  After the Commissioner denied Hodgson's applications initially and upon reconsideration, an Administrative Law Judge ("ALJ") held a hearing on February 3, 2010, in New Orleans, Louisiana.  Tr. 24-44.  On March 26, 2010, the ALJ found Hodgson not disabled.  Tr. 10-18. The Appeals Council denied review on July 22, 2010.  Tr. 1-3.   The Appeals Council decision is a final decision of the Commissioner, subject to review by this court.  20 CFR § 410.670a.

## BACKGROUND

### I.    Medical Record

The medical record begins in December 1998 when orthopedic consultant Richard Scheinberg, M.D., diagnosed lumbar strain and a possible disc injury in conjunction with Hodgson's worker's compensation claim.  Tr. 320-24.  Various physicians continued to follow Hodgson in the course of her worker's compensation claim throughout 1999 and 2000.  Tr.  331-48, 365-78.  Elliot Schaffzin, M.D., terminated his physician-patient relationship with Hodgson on June 28, 2000, because he was concerned about Hodgson's narcotic use.  Tr. 184, 326.  In September 2000, examining physician Steven Nagelberg, M.D., diagnosed "discogenic low back

---

[1]  Citations to "Tr." refer to indicated pages in the official transcript of the Administrative Record filed with the Commissioner's Answer on February 24, 2011 (docket # 12).

pain." Tr. 378.  In January 2001, he noted that she still had a "high level of pain, " diagnosed a "disc disruption," declared her stationary, and recommended spinal fusion surgery.  Tr. 360-61. On September 13, 2001, Bruce Matthews, M.D. noted that Hodgson ambulated with a limp, and diagnosed "stable" chronic back pain.  Tr. 259.

Psychiatrist Albert Shnaider, M.D., evaluated Hodgson on June 26, 2002.  Tr. 194-95. He reviewed Dr. Nagelberg's 2001 progress reports pertaining to Hodgson's lumbar spine (Tr. 191) and diagnosed dysthymia with anxiety based upon Hodgson's reported history, but found no "objective evidence of any psychiatric impairment."  Tr. 194-95.  He concluded that her symptoms should significantly reduce "[w]ith pain alleviation, as well as appropriate psychiatric treatment."  Tr. 195.

The record is then silent until September 9, 2003, when Hodgson referred herself to a chiropractor for back pain.  Tr. 392-99.  Hodgson subsequently visited the emergency room complaining of back pain and headaches in February and April 2004.  Tr. 401, 407. Neurosurgeon John M. Kast, M.D, evaluated Hodgson on March 9, 2006, stated that her symptoms were "dramatically out of proportion to what I can explain" based upon a recent MRI study.  Tr. 269.  He concluded that she was not a surgical candidate as he was "not even sure if the true source of her pain is deeply rooted in the structural integrity of her vertebral bodies and disc."  *Id*.  Instead, he recommended "tighter pain control" through "one of the longer acting narcotic medications," psychiatric care, and weight loss.  *Id*.

Between January 4, 2007, and January 16, 2008, Randy McCoy, M.D., and Bruce Matthews, M.D., a pain specialist, served as Hodgson's primary care providers.  Tr. 210-20, 247-59.  They continued to assess lower back pain throughout this period.  *Id.*  Dr. McCoy noted that

Hodgson asked for increased Norco[2] doses on April 27, 2007 (Tr. 219), and Dr. Matthews noted

on July 2, 2007, that Hodgson specifically stated that "Norco" relieves her pain.  Tr. 213.

On a referral from Dr. McCoy, neurosurgeon Kent D. Yundt, M.D., gave Hodgson

bilateral L4-5 and L5-S1 facet joint blocks in January 2007 with no relief.  Tr. 203-04.  Due to

her failure to respond to the injections and the results of a lumbar SPECT scan, Dr. Yundt

concluded on March 13, 2007, that she was not a surgical candidate.  Tr. 200.

In connection with the worker's compensation claim, Rocco Calderone, M.D., evaluated

Hodgson on October 30, 2007.  Tr. 222-26.  Dr. Calderone reiterated Hodgson's reported history

of back pain and reviewed her available medical records.  Tr. 223-25.  He found non-organic

pain signs upon examination and diagnosed moderate to severe degenerative disc disease at L4-5

and L5-S1, with facet arthropathy,[3] "early, slight" degenerative scoliosis at L4-5, and "status post

failed IDET procedure at L4-5 and L5-S1."  Tr. 228-29.  Dr. Calderone stated that "her condition

has changed as she does require additional medical treatment" based on "evidence of new and

further disability."  Tr. 230.  That treatment "normally would require a lumbar fusion at L4-5 and

L5-S8," but he found her to be "a poor candidate for surgical treatment without correction for her

underlying pain behavior and increased use of narcotics."  *Id*.  He noted that "[a]bsent a

rehabilitation program or surgical treatment, it does not appear [her] condition will change

significantly with continued use of opioid medication alone."  *Id*.  He concluded that she could

---

[2]  Norco is a narcotic pain reliever that contains a combination of acetaminophen and hydrocodone. Hydrocodone is a narcotic.  "Norco," Drugs.com, available at http://www.drugs.com/norco.html (last visited September 10, 2011).

[3]  The record indicates "facet arthroscopy," which is likely a typographical error.

4 - FINDINGS AND RECOMMENDATION

not return to her previous work "even with additional treatment," but assessed no specific work-related limitations.  Tr. 230-31.

On February 6, 2008, Dr. Matthews noted Hodgson's reports of back pain and headache and also noted her "flat affect."  Tr. 290.  On April 28, 2008, he stated that Hodgson's back pain remained the same with reduced narcotic medication.  Tr. 287.  On June 4, 2008, he observed that Hodgson "walks with her legs apart and favors her lumbar spine in a symmetric way without flexing her back or twisting . . . when she walks" and stated that she was unwilling to reduce her medication.  Tr. 282.

Responding to a letter from Hodgson's counsel, on August 13, 2008, Dr. McCoy indicated that Hodgson "certainly has back pain," although "the exact etiology is still somewhat unknown as there have been conflicting opinions regarding the potential sources."  Tr. 263.  Dr. McCoy also indicated that while imaging studies showed objective evidence of back pain, clinical findings were "mostly" limited to Hodgson's subjective complaints and that the most recent evaluation suggested Hodgson "had pain symptoms out of proportion to the objective findings."  *Id*.  He continued to follow Hodgson through December 2009.  Tr. 271-90, 311.

On January 25, 2010, consulting physician Ahmed Ebeid, M.D., reviewed Hodgson's MRI studies and diagnosed chronic back pain, degenerative disc disease, and facet joint disease.  Tr. 317.  However, he found "no objective findings to explain the amount of pain and disability that the patient perceives" and noted that "she has failed [t]he attempts to wean her off medications in the past."  *Id*.  He recommended converting her oral opiates to methadone and "psychological counseling and treatments."  *Id*.  However, Hodgson "declined treatment here due to the distance she has to travel."  *Id*.

II.    **Hodgson's Testimony**

A.    **August 13, 2007 Written Testimony**

On August 13, 2007, Hodgson completed a "Function Report" in conjunction with her application.  Tr. 127-34.  She stated that during the day, she rests in bed and watches television.  Tr. 127, 131.  At night, she awakes from pain.  Tr. 128.  Her mother helps her with shaving and washing her hair.  *Id*.  She prepares frozen meals, and can no longer prepare Thanksgiving or Christmas dinners because she cannot stand or bend for long periods of time.  Tr. 129.  Hodgson does not drive because she has no car and finds driving painful.  Tr. 130.  She can lift five pounds and walk 200 to 300 yards before requiring rest.  Tr. 132.

In a "pain questionnaire" completed that same date, Hodgson reported burning, aching, throbbing pain in her lower back "constantly" and "all the time."  Tr. 135.  Walking, standing, and sitting causes this pain which is relieved by bedrest, sitting in a recliner, a heating pad, and medication.  *Id*.  She takes morphine and other narcotic medications and cannot complete household chores or driving.  Tr. 136.  She stated that her mother helps her put her shoes on, and she has no hobbies or pastimes.  Tr. 137.

B.    **February 3, 2010 Hearing Testimony**

At the February 3, 2010 hearing, Hodgson testified that she injured her back lifting a wheelchair into a car in 1998.  Tr. 29.  Her mother helps her with household chores, but she loads the dishwasher, cleans her bedroom, vacuums, and loads wood.  Tr. 31.  These chores amount to about half an hour a week.  Tr. 37.  She no longer drives; her license was suspended due to traffic fines.  Tr. 31.  In an ordinary day, she makes breakfast and helps her mother perform

household chores.  Tr. 32.  She can stand 15 to 20 minutes or walk 100 yards before her feet

swell and her back "locks up."  Tr. 32-33.

Hodgson testified that she uses a cane prescribed by Dr. McCoy, but has not replaced it

since it broke.  Tr. 34.  She can lift five pounds and carry a couple of pieces of light firewood

over a distance 15 or 20 feet.  Tr. 36.  She lays down seven or eight hours per day and must lay

down after sitting 30 to 45 minutes.  Tr. 37, 40.  She does not do much shopping, but will run

into the store for 10-15 minutes on the way to an appointment.  Tr. 38.  She cooks "simple

dishes" and barbecues and walks 50 yards to the mailbox at least two or three times a week for

exercise.  Tr. 38-39.

## III.    <u>Third-Party Testimony</u>

Hodgson lives with her mother, Barbara Becker, who completed a "Third Party Function

Report" on August 13, 2007.  Tr. 138-45.  Becker wrote that Hodgson takes her medication at the

beginning of each day and then rests on the couch "all day every day."  Tr. 138.  Hodgson can no

longer do anything she did before, and Becker helps her dress, wash her hair, shave, and

"sometimes" helps her use the toilet.  Tr. 139.  Becker also wrote that Hodgson cannot complete

household chores, can cook only frozen dinners, goes outside "10 times a day to have a

cigarette," cannot sit long enough to drive, watches television, reads "a little" and talks on the

phone with her siblings.  Tr. 140-42.  She estimates that Hodgson can lift five pounds, sit for 20

to 30 minutes, walk for 15 to 20 minutes, and then must rest 15 minutes before resuming

walking.  Tr. 143.

Becker did not endorse that Hodgson uses a cane, but endorsed her use of glasses.

Tr. 144. Finally, Becker wrote that Hodgson was very active before her "injuries," but "doesn't

have much life now" because she is "in pain all the time and very depressed." Tr. 145.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five

steps in determining disability under the meaning of the Act. 20 CFR § 416.920; *Bowen v.*

*Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If she is, the claimant is not disabled. 20 CFR § 416.920(a)(4)(I). At step two, the ALJ

determines if the claimant has a severe medically determinable physical or mental impairment

that meets the 12 month duration requirement. 20 CFR §§ 416.909; 416.920(a)(4)(ii). If the

claimant does not have such a severe impairment, she is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an

impairment "listed" in the regulations. 20 CFR § 416.920(a)(4)(iii). If the impairment is

determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The

claimant's RFC is an assessment of work-related activities the claimant may still perform on a

regular and continuing basis, despite limitations imposed by her impairments. 20 CFR

§ 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

The ALJ uses this information to determine if the claimant can perform her past relevant

work at step four. 20 CFR § 416.920(a)(4)(iv). If the claimant can perform her past relevant

work, she is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of her

past relevant work, or that the claimant has no past relevant work, the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing

work existing in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094,

1099 (9th Cir 1999); 20 CFR §§ 416.920(a)(4)(v), 416.920(f).  If the claimant cannot perform

such work, she is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at

1098.  If the process reaches step five, the burden shifts to the Commissioner to show that "the

claimant can perform some other work that exists in 'significant numbers' in the national

economy, taking into consideration the claimant's residual functional capacity, age, education,

and work experience."  *Id* at 1100.  If the Commissioner meets this burden the claimant is not

disabled.  20 CFR § 416.920(g).

## <u>THE ALJ'S FINDINGS</u>

The ALJ granted Hodgson's motion to amend her onset date to July 5, 2007, and found at

step one that she had not engage in substantial gainful activity since that date.  Tr. 10, 12.  At

step two, the ALJ found Hodgson's degenerative lumbar disc disease, facet arthrosis, and obesity

to be severe impairments, but at step three, found that they did not meet the Commissioner's

listing.  Tr. 12.  He then found that Hodgson retains the RFC to perform light work.  *Id.*  At steps

four and five, the ALJ found Hodgson unable to perform her past relevant work, but is able to

perform work in the national economy.  Tr. 17.  Thus, the ALJ found Hodgson not disabled.

///

///

9 - FINDINGS AND RECOMMENDATION

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F3d 1219, 1222 (9th Cir 2009), quoting *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id*; *see also Batson*, 359 F3d at 1193. However, this court cannot now rely upon reasoning the ALJ did not assert in affirming the ALJ's findings. *Bray*, 554 F3d at 1225-26, citing *SEC v. Chenery Corp.*, 332 US 194, 196 (1947).

## FINDINGS

Hodgson challenges the ALJ's findings regarding her credibility and lack of a severe mental impairment. She also asserts that the ALJ erroneously omitted the opinion of examining physician Dr. Calderone and her mother's testimony. As a result, Hodgson contends that the ALJ made erroneous step five findings that she was not disabled.

I.      **Hodgson's Credibility**

Hodgson argues that the ALJ failed to give clear and convincing reasons for rejecting her

testimony.

A.      **Legal Standards**

The ALJ must consider all symptoms and pain which "can be reasonably accepted as

consistent with the objective medical evidence, and other evidence."  20 CFR § 416.929(a).  In

the Ninth Circuit, once a claimant shows an underlying impairment which may "reasonably be

expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ

must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*,

504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court

to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v.*

*Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir

1991) (*en banc*).  The ALJ may consider objective medical evidence and the claimant's treatment

history, as well as the claimant's daily activities, work record, and observations of physicians and

third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at

1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as

weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not,

however, make a negative credibility finding "solely because" the claimant's symptom testimony

"is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F3d at 883; *see*

*also Bunnell*, 947 F2d at 346-47.

///

### B.    Analysis

The ALJ found Hodgson's symptom testimony "inconsistent" with his RFC assessment and unsupported by the evidence of record.  Tr. 16.  In support, the ALJ specifically referred to Hodgson's activities of daily living, her failure to follow recommended treatment, her ongoing worker's compensation claim, and the medical record.  *Id.*

### 1.    RFC Assessment

In assessing Hodgson's RFC, the ALJ stated that her "medically determinable impairments could reasonably be expected to cause the alleged symptom; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment."  Tr. 15-16.  Hodgson argues that this statement reverses the manner in which an ALJ considers a claimant's credibility.  The ALJ must consider a claimant's symptom testimony in assessing her RFC.  20 CFR § 416.945(a)(3); SSR 96-8p at *7 (available at 1996 WL 374184).  Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is circular reasoning.  *Carlson v. Astrue*, 682 F Supp2d 1156, 1167 (D Or 2010); *see also Young v. Astrue*, No. 09-23-AC, 2010 WL 331781, at *5 (D Or Jan. 21, 2010).

However, Hodgson misreads the ALJ's statement.  The wording is admittedly confusing and not as clear as it should be.  Nonetheless, it simply conveys the general concept that the RFC assessment includes those statements by Hodgson concerning her symptoms found credible by the ALJ and excludes her other statements found not credible.  This court does not interpret this statement as the ALJ articulating that he is relying upon his own RFC assessment in order to find

Hodgson not credible.  Instead, the reasons relied on by the ALJ to reject the alleged extent of

Hodgson's limitations are set forth in the paragraphs that follow this introductory statement.

### 2.    Activities of Daily Living

In connection with Hodgson's allegation of inability to sustain sedentary work due to

chronic low back pain and her limited ability to stand, walk or sit, the ALJ discussed Hodgson's

reports of her daily activities.  Tr. 16.  In particular, the ALJ cited Hodgson's testimony that she

"is able to walk 50 yard to the mailbox, carry wood from the wood pile into the house

approximately 20 yards, barbeque and fix simple meals, clean her room, vacuum and load the

dishwasher, to name a few."  *Id.*  Hodgson does not challenge the accuracy of this listing of her

activities of daily living.

The ALJ's credibility analysis may cite a claimant's inconsistent reports of her daily

activities.  *Batson*, 359 F3d at 1196.  A claimant's activities need not amount to work activity,

and the ALJ may reject a claimant's reports of her activities to the extent they are inconsistent

with an allegation of disability.  *Id.*  This court must sustain an ALJ's inferences reasonably

drawn from the record.  *Id.* at 1193.   The ALJ's inference that Hodgson's reported activities

were inconsistent with her allegations of disability to the extent of being bedridden seven or eight

hours per day is reasonable and should be affirmed.

### 3.    Failure to Follow Prescribed Treatment

In discussing Hodgson's drug-seeking behavior, the ALJ stated that Hodgson "has failed

to follow the course of recommended treatment on more than one occasion."  Tr. 16.  The ALJ

specifically noted that "Dr. Matthews' records indicate that [Hodgson] had no interest in trying to

13 - FINDINGS AND RECOMMENDATION

improve her condition" and that Hodgson declined Dr. Ebeid's offer in 2010 to decrease her

opiate use. *Id*. The record supports that finding.

As a result of his consultative exam for Hodgson's chronic back pain on January 25,

2010, Dr. Ebeid recommended that Hodgson "convert her oral opiates to methadone [with] a

dose no higher than 30 mg 3 times daily" and without "any dose escalations thereafter." Tr. 317.

However, Hodgson declined further treatment at his clinic due to travel distances. *Id*. The

record also shows that Hodgson was uninterested in other recommendations that she reduce or

cease her opiate use. Specifically, on January 15, 2008, Dr. Matthews wrote that he was "having

a hard time encouraging her to pursue non-passive treatments despite efforts to encourage her."

Tr. 247. On June 4, 2008, Dr. McCoy stated that Hodgson "notes that she is not willing to

pursue further reductions of her sedative hypnotics. I.e. soma[4] [*sic*]. Encouraged her to

reconsider that notion . . ." Tr. 282. Later on July 23, 2008, Dr. McCoy noted that "there have

been recommendations regarding physical therapy which [Hodgson] apparently did not tolerate . .

. . While one of the consultants recommended weaning her off her narcotics she has done just the

opposite with high doses of both long-acting and short-acting narcotics as well as soma."

Tr. 275.

The ALJ may cite a claimant's unexplained failure to follow treatment in his credibility

analysis. *Smolen*, 80 F3d at 1284. While a claimant may not be chastised for failing to follow

treatment she cannot afford, *Gamble v. Chater*, 69 F3d 319, 321 (9th Cir 1995), Hodgson does not

assert that excuse. Thus, the ALJ's finding that Hodgson failed to follow recommendations to

---

[4] Soma is a formulation of carisoprodol, which is a muscle relaxant. *See* National Institute of Health, *Drugs and Supplements*, "Carisoprodol," available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717/ (last visited August 24, 2011).

14 - FINDINGS AND RECOMMENDATION

decrease her opiate use on more than one occasion is based upon the record and should be affirmed.[5]

### 4.    **Secondary Gain**

The ALJ also stated that Hodgson's pending worker's compensation claims suggested that "the possibility of secondary gain cannot be excluded." Tr. 16.  This court does not chastise disability applicants for seeking benefits and similarly will not fault them for concurrently pursuing worker's compensation claims.  *Ratto v. Sec.*, 839 F Supp 1415, 1428 (D Or 1993).  Thus, this suggestion is not a sufficient reason to discredit Hodgson.

### 5.    **Medical Record and Credibility**

Finally, the ALJ cited Hodgson's medical record throughout his credibility analysis, specifically noting that "[s]ince 2007, there is no indication that physical limitations have been placed upon her," especially her reported need to recline for seven to eight hours per day, and that "[e]ven her treating physicians noted symptom magnification." Tr. 16.  The ALJ may cite the medical record in concert with other factors in assessing a claimant's credibility.  *Robbins*, 466 F3d at 883.

The ALJ is correct that no physician stated that Hodgson must recline throughout the day. In addition, Drs. McCoy, Kast, and Ebeid repeatedly stated that Hodgson's reported pain was disproportionate to clinical findings.  Tr. 220, 263, 269, 276, 317, 473.  Because the medical record reflects the ALJ's findings, the ALJ did not error by relying on it to discredit Hodgson.

///

---

[5]  The ALJ has a duty to consider medication side effects.  20 CFR § 416.929.  However, neither Hodgson nor the ALJ raised the issue of any side effects caused by Hodgson's opiate use in addressing her credibility.  In fact, Hodgson testified she had no side effects relating to her opiate use.  Tr. 39.

### C.    **Credibility Conclusion**

This court may affirm an ALJ's credibility analysis even when it does not uphold all of the ALJ's reasons for finding a claimant not credible.  *Batson*, 359 F3d at 1197; *see* also *Bray*, 554 F3d at 1227 (finding harmless error in such circumstances).  While the ALJ's inference of secondary gain should not be sustained, the ALJ's citation to Hodgson's activities of daily living, failure to follow recommended treatment, and medical record together constitute sufficiently clear and convincing reasons to reject Hodgson's symptom testimony.  Thus, the ALJ's credibility finding should be affirmed.

## II.    **Lay Witness Testimony**

Hodgson asserts that the ALJ erroneously omitted testimony submitted by her mother, Barbara Becker.

### A.    **Legal Standards**

The ALJ has a duty to consider lay witness testimony.  20 CFR §§ 416.913(d), 416.945(a)(3); *Bruce v. Astrue*, 557 F3d 1113, 1115 (9th Cir 2009).  Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition.  *Dodrill v. Shalala*, 12 F3d 915, 918-19 (9th Cir 1993).  The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony.  *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996).

### B.    **Analysis**

The ALJ did not cite or discuss Becker's testimony.  This court may not affirm silent omission of lay witness testimony unless it can confidently conclude that no reasonable ALJ,

when fully crediting the omitted testimony, would reach a different disability conclusion. *Stout v. Comm'r*, 454 F3d 1050, 1055-56 (9th Cir 2006).

Becker testified that Hodgson cannot lift more than five pounds. Though the ALJ rejected Hodgson's own testimony that she cannot lift more than five pounds (Tr. 16), the ALJ did not address Becker's identical testimony. An ALJ may reject lay testimony that mirrors complaints of a claimant found not credible, but the ALJ must "tie the reasoning of their credibility determinations to the particular witnesses whose testimony they reject." *Valentine v. Barnhart*, 574 F3d 685, 694 (9th Cir 2009). The ALJ failed to do so, and this court cannot now rely upon reasoning the ALJ did not assert. *Bray*, 554 F3d at 1225-26; *Connett*, 340 F3d at 874.

The ALJ found that Hodgson could perform light work. Tr. 12. Light work entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 CFR § 416.967. Fully crediting Becker's testimony would not allow Hodgson to perform the ALJ's RFC assessment regarding light work, which in turn would prompt different vocational expert testimony regarding Hodgson's ability to perform work in the national economy at step five in the sequential proceedings. In such circumstances, this court cannot "confidently conclude" that fully crediting Becker's omitted testimony would result in the same disability determination under the *Stout* standard. The ALJ's omission of Becker's testimony is therefore erroneous.

## III.   **Dr. Calderone's Opinion**

Hodgson argues that the ALJ ALSO erred by not addressing Dr. Calderone's October 30, 2007 worker's compensation evaluation.

///

17 - FINDINGS AND RECOMMENDATION

A.    **Legal Standards**

Disability opinions are reserved for the Commissioner.  20 CFR § 416.927(e)(1).  When making that determination, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  The ALJ must also generally give greater weight to the opinion of an examining physician over that of a reviewing physician.  *Id.*  If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician.  *Id* at 830.  The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings."  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).

B.    **Analysis**

In his examination on October 30, 2007, Dr. Calderone found that Hodgson exhibited non-organic pain signs and diagnosed moderate to severe degenerative disc disease at L4-5 and L5-S1 with facet arthropathy, and slight degenerative scoliosis at L4-5.  Tr. 229.  He cited Dr. Nagelberg's 2001 opinion that Hodgson should be restricted to sedentary work and concluded that his own examination showed evidence of "new and further disability."  Tr. 230.  However, he did not identify any work-related limitations and stated only that "it does not appear that she will be able to return to her previous occupation even with additional treatment."  Tr. 231.

Hodgson asserts that the ALJ's failure to discuss Dr. Calderone's opinion was erroneous because Dr. Calderone suggested that she might benefit from surgery contrary to the ALJ's finding that she would not benefit from surgery.  However, Dr. Calderone did not say that

Hodgson might benefit from surgery.  Instead, he said only that she "normally would be indicated for lumbar fusion; however, she represents a poor candidate for surgical treatment without correction of her underlying pain behavior and increased use of narcotics."  Tr. 230.  This is the same conclusion reached by other examining physicians, namely Dr. Kast in March 2006 and Dr. Yundt in March 2007, that Hodgson was not a surgical candidate.  Tr. 200, 269.

This court may find an ALJ's omission harmless when the ALJ's decision remains legally valid despite the error.  *Carmickle*, 533 F3d at 1162, citing *Batson*, 359 F3d at 1197.  Because Dr. Calderone does not cite any work-related limitations relevant to a determination of disability, and did not otherwise contradict the ALJ's decision, the ALJ's findings would remain the same even if the ALJ had discussed Dr. Calderone's opinion.  Hodgson therefore fails to establish any reversible error regarding Dr. Calderone's opinion regarding surgery.

## IV.    <u>Alleged Mental Impairment</u>

Hodgson contends that the ALJ erroneously omitted her alleged mental impairment at steps two and four of the sequential proceedings.

### A.    <u>Legal Standards</u>

The claimant must provide evidence relating to her impairments and their severity. 20 CFR § 416.912(a) & (c).  However, the ALJ has a duty to develop the record when the claimant's onset date is ambiguous, *Armstrong v. Comm'r*, 160 F3d 587, 590 (9th Cir 1998), or when the record is too inadequate for the Commissioner to make a proper disability determination.  20 CFR § 416.913(e); *Bayliss*, 427 F3d at 1217.  This duty exists "even when the claimant is represented by counsel" and is heightened when a claimant is unrepresented.  *Celaya v. Halter*, 332 F3d 1177, 1183 (9th Cir 2003) (citations omitted).  The duty does not arise when

the record reflects no impairment or associated limitations, *Burch v. Barnhart*, 400 F3d 676, 682 (9th Cir 2005), but the reviewing court will not chastise a claimant for failing to assert an impairment she did not know she could assert. *See Celaya*, 332 F3d at 1183 (ALJ erred in failing to develop record for illiterate, unrepresented client).

An impairment is "not severe" at step two if it "does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a). As explained by the Ninth Circuit, an impairment is not severe "if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F3d 683, 686 (9th Cir 2005), quoting *Smolen*, 80 F3d at 1290.

### B.    <u>Analysis</u>

It is noteworthy that Hodgson did not initially assert disability due to a mental impairment Tr. 117. She was represented by counsel at her hearing before the ALJ, and her "Hearing Memorandum" submitted to the ALJ in conjunction with her February 3, 2010 hearing made no reference to any mental impairment. Tr. 179-83. At the hearing, Hodgson's counsel cited a "somatization" impairment (Tr. 28), but did not develop this argument or assert any work-related limitations pertaining to any mental impairment. Moreover, Hodgson did not testify at the hearing to any mental impairment or describe any work-related limitations stemming from a mental impairment. She also failed to assert any mental impairment before the Appeals Council.

Nonetheless, the medical record contains some references to a possible mental impairment. Hodgson received a dysthymia diagnosis from evaluating psychiatrist Dr. Shnaider on June 26, 2002. Tr. 194. Treating physician Dr. Matthews observed a "flat affect" on September 13, 2007 (Tr. 259), and diagnosed depression on July 12, 2008, for which he

prescribed Wellbutrin.  Tr. 278.  Later both Drs. Ebeid and Calderone suggested the need for

psychological counseling, recognizing a psychological component to her condition.  Dr. Ebeid

thought that psychological counseling, coupled with cognitive behavioral therapy, biofeedback

and other "living with pain" modalities would benefit her condition.  Tr. 472.  Dr. Calderone

suggested a multi-disciplinary physical rehabilitation program with assessment and treatment of

psychological factors and attempts to wean Hodgson off of short and long-term narcotics.

Tr. 230.  In addition, lay witness Becker wrote that Hodgson "has no life because of the pain and

being depressed."  Tr. 144.

This evidence, in combination, suggests that Hodgson may have a mental impairment that

more than minimally effects her workplace abilities at step two in the sequential proceedings.

Omissions at step two are harmless if the ALJ's subsequent analysis considered the effect of the

omitted impairment.  *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  Here the ALJ did not

discuss this evidence in his subsequent sequential evaluation.  Accordingly, this court cannot

conclude that the ALJ's omission at step two was harmless.

When the record is inadequate to make a disability determination, the ALJ must develop

the record so that such a determination may be made.  20 CFR § 416.913(e); *Bayliss*, F3d at

1217.  The record suggest that Hodgson has a mental impairment, but contains no evaluation

pertaining to that impairment after June 2002.  A consulting examination may establish that no

such impairment exists.  *See id* (affirming ALJ's rejection of examining psychologist's report

regarding a mental impairment).  However, the consultation must be relevant to the period under

review, which begins in this case on July 5, 2007, five years after Dr. Shnaider's report.  Because

Dr. Shnaider's report does not address Hodgson's mental limitations during the relevant period,

the ALJ should obtain additional evidence to determine if Hodgson's mental difficulties have had any impact upon her ability to perform work activity throughout the period she alleges disability.

## V.    Step Five Findings

Finally, Hodgson asserts that the ALJ erroneously found that she could perform work in the national economy. She specifically asserts that the vocational expert's testimony establishes disability, based upon her own testimony that she must recline throughout the day.

At step five, the ALJ may draw upon a vocational expert's testimony to show that claimant can perform work in the national economy. *Tackett*, 180 F3d at 1101. The ALJ's questions to the vocational expert must include all properly supported limitations. *Osenbrock v. Apfel*, 240 F3d 1157, 1165 (9th Cir 2001). Because the ALJ properly rejected Hodgson's symptom testimony, the ALJ's omission of her stated limitations from his questions to the vocational expert at step five should be sustained.

However, the ALJ propounded hypothetical questions to the vocational expert based upon an RFC assessment which did not include limitations described by Hodgson's mother, specifically that Hodgson could not lift more than five pounds. Because the ALJ's silent omission of the lay testimony cannot be sustained, the vocational expert's testimony is without probative value. Further, this court cannot determine, based upon the present record, whether Hodgson had mental limitations affecting her workplace abilities. The ALJ's failure to include such limitations in his questions to the vocational expert may also be erroneous. For these reasons, the ALJ's step five finding should not be sustained, and the effect of this error is described below.

*///*

22 - FINDINGS AND RECOMMENDATION

VI.    **Remand**

The ALJ erroneously evaluated lay witness Becker's testimony and failed to develop

Hodgson's potential mental impairment.  The decision whether to remand for further proceedings

or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211

F3d 1172, 1178 (9th Cir 2000), *cert denied*, 531 US 1038 (2000).  The issue turns on the utility of

further proceedings.  A remand for an award of benefits is appropriate when no useful purpose

would be served by further administrative proceedings or when the record has been fully

developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss v.*

*Comm'r*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593

(9th Cir 2004).  The court may not award benefits punitively, and must conduct a "credit-as-true"

analysis to determine if a claimant is disabled under the Act.  *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate

award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence, (2) there are no outstanding issues that must be resolved before a

determination of disability can be made; and (3) it is clear from the record that the ALJ would be

required to find the claimant disabled were such evidence credited."  *Id.*  The "crediting as true"

doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in

determining whether to enter an award of benefits upon reversing the Commissioner's decision.

*Connett*, 340 F3d at 876, citing *Bunnell*, 947 F2d at 348.  The reviewing court declines to credit

testimony when "outstanding issues" remain.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

The ALJ erred by failing to discuss Becker's testimony and by failing to develop the

record regarding Hodgson's possible mental impairment at step two in the sequential

proceedings. The ALJ's subsequent RFC assessment and hypothetical questions to the vocational expert at step five in the sequential disability analysis are therefore not based upon the proper legal standards.

However, it is not clear from the record that crediting the omitted evidence establishes that Becker is disabled at step five in the sequential proceedings. Becker stated that Hodgson could lift no more than five pounds. Tr. 143. Hodgson did not assert any specific mental limitation that this court may now credit. Neither Hodgson's counsel nor the ALJ elicited testimony from the vocational expert addressing the lifting restriction described by Becker or an alleged mental limitation. Tr. 41-44.

In such instances, awarding benefits is inappropriate. *Harman*, 211 F3d at 1180; *see also Luna*, 623 F3d at 1035. The matter must be remanded for further proceedings to address the lay witness testimony and to develop the record regarding Hodgson's possible mental impairment. If necessary, the ALJ must then revise his RFC determination. Finally, the ALJ must make adequate step four and five findings incorporating any revised findings.

## <u>RECOMMENDATION</u>

For these reasons, the Commissioner's final decision should be REVERSED and REMANDED pursuant to sentence four of 42 USC § 405(g) for further proceedings consistent with this Findings and Recommendation.

## <u>SCHEDULING ORDER</u>

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due October 4, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated September 14, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge